2025 IL App (1st) 221715-U

FIFTH DIVISION
June 27, 2025

No. 1-22-1715

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court Of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 MC4 00602301 |
| | ) | |
| CINDY PLASCENCIA, | ) | Honorable |
| | ) | Sheree D. Henry, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's misdemeanor battery conviction is affirmed where (1) the State presented sufficient evidence to support a finding of her guilt beyond a reasonable doubt; (2) her right to a speedy trial was not violated, and (3) the trial court's evidentiary rulings were not an abuse of discretion.

¶ 1    Following a bench trial, defendant Cindy Plascencia was found guilty of battery (720 ILCS 5/12-3(a)(1) (West 2020)) and sentenced to one year of court supervision. Ms. Plascencia now appeals, arguing that (1) the trial court's finding that she was guilty beyond a reasonable doubt of the charged offense was contradicted by the video evidence, (2) her right to a speedy trial was

violated, and (3) the trial court abused its discretion when it sustained several of the State's evidentiary objections. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     The State charged Ms. Plascencia with battery, under section 12-3(a)(1) of the Criminal Code of 2012 (720 ILCS 5/12-3(a)(1) (West 2020)), alleging that she knowingly and without legal justification caused bodily harm to the complaining witness, Gracia Pantoja, on July 5, 2020, by striking her with a closed fist in the face, causing Ms. Pantoja to suffer a laceration to the bridge of her nose and an abrasion to her back during the ensuing altercation.

¶ 4                     A. Pretrial Scheduling During the COVID-19 Pandemic

¶ 5     Ms. Plascencia answered ready for trial on August 4, 2020, and made a written demand for a speedy trial pursuant section 103-5 of the Code of Criminal Procedure (the speedy trial statute) (725 ILCS 5/103-5 (West 2020)). The parties appeared in court on September 2, 2020, and the case was continued over Ms. Plascencia's objection.

¶ 6     On October 7, 2020 (as the parties note, the transcript for that appearance is mistakenly dated October 7, 2021), the State notified the court that, although it had previously answered ready, it would like a continuance of one month to follow up on "a possible outstanding video." Over defense counsel's objection, the court agreed to a continuance. The judge initially wanted to "just set it to term"—*i.e.*, to set the case for trial on the last day permitted by the speedy trial statute— but the assistant state's attorney (ASA) calculated that the term would expire on December 30, 2020, during a week in which the courtroom would not be open, and so the court proposed November 4, 2020, instead. Defense counsel explained that she was expecting to give birth at around that time, and so the parties agreed to a trial by videoconference beginning on December 17, 2020.

¶ 7    On November 23, 2020, the Circuit Court of Cook County issued General Order 2020-07, which modified certain COVID-19 emergency measures that had been in place beginning in March of that year. At the time that the order was issued, limited in-person operations and services had resumed, but most matters were being conducted remotely via videoconference. The order made clear that, subject to constitutional restrictions and "except in extraordinary or compelling circumstances, all matters in all Districts and Divisions of the court [were to] be conducted by videoconference." General Order 2020-07 (first item following the introductory paragraphs).  It further provided that "[n]o bench trials in criminal cases and no jury trials of any kind shall be held until further order of the court" (*id.* § 1(a)(v)) and instructed that any delays resulting from the order (or its predecessors) would "not be attributable to either the State or the defendant for purposes of section 103-5 (speedy trial) of the Code" (*id.* § 1(c)(vii)).

¶ 8    The parties appeared via videoconference on December 17, 2020, the date they had agreed upon for trial. The trial judge stated, "We are not having any in-person trials today," noted that her file did not indicate whether the trial in this matter was to be in-person or not and asked the parties what they wanted to do. Defense counsel indicated that Ms. Plascencia was ready for trial, "through Zoom court." The ASA stated her belief that "[p]ursuant to the general order *** I don't believe that we are supposed to have a trial." Defense counsel stated that she believed only in-person bench trials were suspended under the new order. The court appears to have agreed, and, given that the State was not ready, proceeded to negotiate a new date for a trial by videoconference. Defense counsel objected to this, pointing out that the case would "be termed out" on December 30. The court reassured her that because General Order 2020-07 tolled the speedy trial term, the State was "not going to run out of time," and the parties could choose another date for trial. Counsel again objected. The new order "[didn't] actually change what [they] were going to do in this case, which

3

was to have a trial via Zoom," counsel insisted, so they should proceed as planned. The State complaining witness, Ms. Pantoja, was not present, and if that was the only reason the State was not answering ready, then counsel felt that "warrant[ed] a dismissal." The court was not persuaded. In its view, the order tolled the speedy trial term in all cases, the State was within its term, it was answering not ready, and the court was free to grant the State a continuance. January 6, 2021, was selected as the new date for a trial by teleconference.

¶ 9                                    B. Ms. Plascencia's Trial

¶ 10   Ms. Plascencia waived her right to a jury trial, and a bench trial was held via videoconference on January 6 and February 24, 2021, concluding in-person on March 8, 2021.

¶ 11   The State's theory of the case was that Ms. Pantoja was at Ms. Plascencia's house on the morning of July 5, 2020, to pick up her daughter, A.L., whom she shared custody of with A.L.'s father, who was Ms. Plascencia's fiancé. Ms. Pantoja and Ms. Plascencia "exchanged words" and, as Ms. Pantoja was leaving, Ms. Plascencia pushed her, prompting a physical altercation that led to Ms. Pantoja suffering several injuries.

¶ 12   Defense counsel argued the evidence would show that Ms. Pantoja was belligerent, banging on the door on a Sunday morning when A.L. was meant to be with her father. Counsel told the court that the video evidence would show that A.L. exited the house, but Ms. Pantoja did not follow her. Rather, she remained inside Ms. Plascencia's doorway and made contact with Ms. Plascencia. According to the defense, Ms. Pantoja, and not Ms. Plascencia, was the one who "initiated a battery," and Ms. Plascencia acted in self-defense during the fight that ensued.

¶ 13                                    1. The State's Case

¶ 14                                    *Gracia Pantoja*

¶ 15   The State called Gracia Pantoja as its only witness. Ms. Pantoja testified that she was 30

years old and was a stay-at-home mother living in Berwyn, Illinois. She had shared custody of her daughter, A.L., who was 13 years old at the time of trial, with her ex, Axel Laiva (also spelled "Leyva" in portions of the record), pursuant to a court-ordered parenting agreement. Ms. Pantoja explained that Mr. Laiva had custody of A.L. every other weekend and on Wednesdays. The two of them shared holidays, and A.L. was scheduled to be with Ms. Pantoja over the Fourth of July weekend. On Saturday, July 4, 2020, after Ms. Pantoja had set off fireworks with her children (A.L. and her brother), A.L. asked to go to her father's house so she could set off more fireworks. Ms. Pantoja agreed, and A.L. wound up staying the night at the home where Mr. Laiva lived with Ms. Plascencia.

¶ 16    The next morning, Sunday, July 5, 2020, Ms. Pantoja called and texted A.L. and Mr. Laiva to see if they were going to church or if they needed Ms. Pantoja to take A.L. to church. Ms. Pantoja did not attend the church, but she knew A.L. needed to attend that day for a special event. Receiving no response, sometime after 9 a.m. Ms. Pantoja drove to the house where Mr. Laiva lived with Ms. Plascencia.

¶ 17    Ms. Pantoja explained that the house was set back from the sidewalk but that there was no gate, just three steps and a front stoop. She knocked on the screen door and, when there was no answer, opened it and knocked on the wood door. Mr. Laiva called out, "Who is it?" without opening the door, and Ms. Pantoja said, "It's me, I'm here to pick [A.L.]" He went to wake A.L. up, and Ms. Pantoja sat down on the stoop, about four or five feet away from the door. Ms. Plascencia then came to the door, stood in the doorway with the screen door partially open, and, according to Ms. Pantoja, "was very aggressive." "She was saying that I ha[d] no manners, that my mom didn't raise me right. She was cursing. She kept on saying, Try me, try me."

¶ 18    Ms. Pantoja stood up and explained why she was there. She "got close to [Ms. Plascencia's] face" and then sat back down. Ms. Plascencia kept saying "Try me, try me," however, and Ms. Pantoja "got up in her face" a second time. A.L. When asked how all of this made her feel, Ms. Pantoja said: "Well, I just was uncomfortable. I don't want to be weak. And, like, I'm there to pick up my daughter and that's it." A.L. was standing behind Ms. Plascencia, and Ms. Pantoja grabbed her daughter's hand and escorted her out of the house. At that point, Ms. Plascencia said, "And don't come to my house again," and Ms. Pantoja told her, "If I have to knock on your door to get my daughter, that's what I am going to do."

¶ 19    "I turned around and left," Ms. Pantoja testified, "and that's when she pushed me." Ms. Plascencia shoved her in the back with both hands, and a fight broke out. Mr. Laiva and Ms. Plascencia's son came out of the house and A.L. and Ms. Pantoja's boyfriend came running from her car. Ms. Pantoja stated that she suffered two injuries, a cut on her back, and a deep cut on her nose that was bleeding. She had viewed video footage from a doorbell camera of the encounter, and she agreed that, although there was no audio, it otherwise accurately depicted the events that she had described. Defense counsel stipulated to the video's admissibility, and the State played the first five minutes, stopping at various points to confirm with Ms. Pantoja what the footage showed. Ms. Pantoja identified the point in the video at which she grabbed ahold of her daughter's hand and "escorted her out the doorway." She insisted, however, that she never touched Ms. Plascencia prior to Ms. Plascencia shoving her.

¶ 20    On cross-examination, Ms. Pantoja explained that she was required, by the parenting agreement she had with Mr. Laiva, to take A.L. to church on weekends in which she had custody of her. There followed a lengthy discussion of the terms of the parenting agreement and objections by the State to the relevance of that testimony. Ms. Pantoja explained that A.L. had her permission

to go with Mr. Laiva on the evening of Saturday, July 4, but that he never asked if A.L. could sleep over. He was supposed to call her when they were done setting off fireworks, and it was Ms. Pantoja's expectation that she would pick A.L. up later that night. Ms. Pantoja explained that when she said she didn't want to be weak, what she meant was that she wanted to "stand up for [her] daughter and taking her where she needed to be." She did not want to "just sit by and allow her not to go to her [church] function." Ms. Pantoja agreed that she stood in the doorway talking to Ms. Plascencia for a moment after A.L. had walked past them out of the house. She explained that it was important for her to respond to what Ms. Plascencia had said to her. She acknowledged that she leaned into the doorway but denied touching Ms. Plascencia.

¶ 21    On redirect examination, Ms. Pantoja insisted that at no point prior to the physical altercation was she angry or insulting to Ms. Plascencia. She spoke to her calmly and could not understand why Ms. Plascencia was so upset with her. Ms. Pantoja "got in her face" at one point because Ms. Plascencia kept trying to provoke her, but her "intentions were never to put [her] hands on [Ms. Plascencia]." She reiterated that at no point had she made contact with Ms. Plascencia before Ms. Plascencia shoved her.

¶ 22    The State rested, and the trial court denied Ms. Plascencia's motion for a directed finding.

¶ 23                                    2. The Defense's Case

¶ 24                                    *Cindy Plascencia*

¶ 25    Ms. Plascencia then took the stand. She testified that she had met Ms. Pantoja multiple times, at pickups and drop-offs, since she began dating Mr. Laiva, and they had no history of animosity. Ms. Plascencia had last seen Ms. Pantoja on July 3 at the church, where Ms. Pantoja was "making a scene," yelling at the catechism director that *she* was A.L.'s biological mother, not Ms. Plascencia; that she, not Ms. Plascencia, should have her name on a church-issued certificate

of completion A.L. would receive; and that she should be the one to receive tickets to attend A.L.'s reconciliation ceremony. Ms. Plascencia expected that she and Mr. Laiva would take A.L. to church on July 5, 2020, because it had been their custom, for over a year, to have brunch after church and drop A.L. off with Ms. Pantoja after that.

¶ 26    Ms. Plascencia testified that she and Mr. Laiva were awakened that morning at about 9 a.m. to a loud banging on the door. She went to the bathroom while Mr. Laiva went to see who it was. She heard Mr. Laiva trying to wake A.L. up and also heard more pounding on the door. Ms. Plascencia went to the door and saw Ms. Pantoja sitting on the stoop. Ms. Pantoja motioned for Ms. Plascencia to come outside, but Ms. Plascencia remained inside. She opened the screen door partway and told Ms. Pantoja "to please respect [her] house and not pound on [her] door like that." Ms. Pantoja seemed upset. According to Ms. Plascencia, Ms. Pantoja "got up off the stoop, came up the stairs and got in [Ms. Plascencia's] face," calling her a "weak b***" and telling her to "do something" while gesturing with her hand in Ms. Plascencia's face. Ms. Plascencia said "[W]ho raised you?" and Ms. Pantoja responded by again calling Ms. Plascencia a "weak b***" and stating that she was A.L.'s biological mother and would be on her church certificate, not Ms. Plascencia. Ms. Pantoja then sat back down but continued to yell, calling Ms. Plascencia a "[s]tupid b***" and a "dumb b***." Ms. Plascencia told her, "Do not bang on my door." At this, Ms. Pantoja stood up and "got in [Ms. Plascencia's] face for a second time," yelling, cursing, and waving her hand in Ms. Plascencia's face. She kept opening the screen door every time it swung shut and telling Ms. Plascencia to come out of the house. Ms. Plascencia said, "This is my house, I'm not leaving."

¶ 27    At this point, A.L. appeared, and Ms. Pantoja "leaned in" and "pulled her out." A.L. exited the house, and Ms. Pantoja "leaned in again and crossed [Ms. Plascencia] with her left hand," making contact with Ms. Placencia's left cheek with the back of her open hand. Ms. Plascencia

8

leaned back and "went to move [Ms. Pantoja's] arm, and then the altercation ensued." Mr. Laiva and Ms. Pantoja's fiancé, who had been waiting in her truck, both approached and tried to separate the two women. Ms. Plascencia went back into her house, but Ms. Pantoja was still yelling and refusing to leave. She said "[W]atch, b***tch" and announced that she was going to call the police. The police did come, but they did not arrest Ms. Plascencia at that time.

¶ 28    On cross-examination, Ms. Plascencia denied saying "[T]ry me" to Ms. Pantoja or ever raising her voice until, in her words, Ms. Pantoja "back-handed" her. She denied putting her hands on Ms. Pantoja while Ms. Pantoja was exiting the porch. And she denied giving any statement to the police, including telling them that Ms. Pantoja had initiated contact with her. The police spoke to Mr. Laiva, who played the video recording of the interaction for them. When asked if that video was a fair and accurate representation of what had occurred, Ms. Plascencia said "no"; because of the angle of the camera, the video did not show everything that happened.

¶ 29                                   *Ms. Pantoja (in rebuttal)*

¶ 30    The State recalled Ms. Pantoja, and she testified that at no point did she ever reach inside Ms. Plascencia's house and "backhand her cheek" or touch her with any part of her body. Ms. Pantoja also denied ever telling Ms. Plascencia to exit her home.

¶ 31                                   3. Closing Arguments

¶ 32    In its closing argument, the State argued that much of the testimony the court had heard was irrelevant to the question before it: had there been a battery? The State asked the court to focus on the fact "that the complaining witness was leaving," because "self-defense is not available to somebody when who they're asserting to be the initial aggressor has left." Ms. Pantoja was walking away—she had her daughter and "[s]he was out the door"—and that was "the most important part about what [the court was] going to be considering."

¶ 33    Defense counsel argued that Ms. Pantoja had been upset by the extent of Ms. Plascencia's involvement in A.L.'s life, and that she "came looking for a fight and she got one, except it didn't turn out the way that she wanted." Counsel acknowledged that not everything could be seen in the video, but pointed out that it did show Ms. Pantoja still standing in the doorway "with her arm up gesticulating in front of [Ms. Plascencia]" when A.L. had already clearly exited the home. The court should believe Ms. Plascencia's testimony, counsel argued, that Ms. Pantoja "proceeded to touch [Ms. Plascencia] inside her house, and then as [she was] turning away, [Ms. Plascencia] did swat [Ms. Pantoja's] hand away." That, counsel maintained, is what started the fight, and Ms. Plascencia had acted in self-defense.

¶ 34    The State noted in rebuttal that self-defense was not something you could "just loosy goosy argue." There were a number of separate elements to the defense, and Ms. Plascencia had failed to show not only that force was threatened against her and that Ms. Pantoja was the initial aggressor, but, importantly, that the danger of harm to Ms. Plascencia was imminent, or that the force she used in response was objectively reasonable.

¶ 35                    4. Finding of Guilt, Sentencing, and Posttrial Motion

¶ 36    The trial court found Ms. Plascencia guilty as charged on the single count of battery and, on March 26, 2021, sentenced her to twelve months of nonreporting court supervision and anger management classes. The court found that, although Ms. Pantoja had allowed A.L. to see the fireworks with her father the night before, it was Ms. Pantoja's weekend to have custody of A.L., and the parenting agreement provided that whoever had the child for the weekend was responsible for making sure she attended church. Ms. Pantoja was at Ms. Plascencia's residence on the morning of July 5, 2020, in accordance with the parenting agreement, to pick A.L. up and take her to church.

¶ 37    The court then described what it had seen in the video footage:

10

"The Court believes, and the Court saw that the complaining witness went to the door, knocked on the door, on the screen door, there was no answer. She opened the screen door and she knocked on the door about three to four times. At that point, the Court can see movement from her lips, although the Court doesn't see anybody. She then sits on the side step. And at that point the Court sees the screen door open. The Court sees the complaining witness's lips move, assume there was a conversation. Now, we have heard testimony from Ms. Plascencia that they were asleep, they heard knocking, her and—her and the child in question. Father heard knocking. They got up, she went to the bathroom. The father went to the door. She testified that when she came out of the bathroom, she still heard knocking. However, the Court has had an opportunity to see the video after the conversation with the complaining witness's daughter's father she sat on the stoop. So there was no more knocking at that point. The defendant went to the door, and initiated the conversation with the complaining witness."

¶ 38 The court believed that Ms. Plascencia was unhappy that Ms. Pantoja had come to collect A.L., that a verbal dispute ensued, and "when [Ms. Pantoja] turned to leave, [Ms. Plascencia] pushed her in the back." The court did not find Ms. Plascencia's testimony that Ms. Pantoja first entered the house or touched Ms. Plascencia to be at all credible. "Based upon the swiftness in which a fight ensued after the defendant pushed the complaining witness in the back," the court explained, "if there had been contact in the house, then a fight would have ensued at that point, not afterwards."

¶ 39 Ms. Plascencia filed a post-trial motion on April 22, 2021, which she amended on October 25, 2021. She argued, among other things, that the court's finding that she was guilty of battery beyond a reasonable doubt was inconsistent with the video evidence, that she was denied a speedy

trial, and that the court erred in sustaining several of the State's evidentiary objections. The trial court denied the motion on May 16, 2022, and this appeal followed.

¶ 40                                    II. JURISDICTION

¶ 41    Ms. Plascencia states in her jurisdictional statement that her appeal is "from a final judgment of conviction in a criminal case" and that jurisdiction lies in this court pursuant to Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013), and 606 (eff. March 12, 2021). As the State points out, however, orders of supervision are not final judgments. See *Village of Park Forest v. Thomason*, 145 Ill. App. 3d 327, 332 (1986) (explaining that "[t]he status of a case under an order of supervision is in the nature of a continuance until the conclusion of the period of the supervision"). Such orders are, however, immediately appealable under Illinois Supreme Court Rule 604(b), which provides that "[a] defendant who has been placed under supervision or found guilty and sentenced to probation or conditional discharge [citation], or to periodic imprisonment [citation], may appeal from the judgment and may seek review of the conditions of supervision, or of the finding of guilt or the conditions of the sentence, or both." Ill. S. Ct. R. 604(b) (eff. July 1, 2017). Ms. Plascencia filed her notice of appeal on June 15, 2022, within 30 days of the trial court's denial, on May 16, 2022, of her amended post-trial motion. We therefore have jurisdiction over this appeal under Rule 604(b).

¶ 42                                    III. ANALYSIS

¶ 43                          A. Sufficiency of the State's Evidence

¶ 44    Ms. Plascencia argues that the trial court erred when it found her guilty beyond a reasonable doubt of battery. We consider this issue first because if the State's evidence was insufficient to support that finding, Ms. Plascencia's conviction should be reversed outright, and we would have no need to consider her other arguments. The State argues that Ms. Plascencia's appellate brief

fails to comply with the Illinois Supreme Court Rules in various respects, including that, in violation of Rule 341(h) (Ill. S. Ct. R. 371(h)(7) (eff. Oct. 1, 2020), she has not cited any legal authorities in support of this argument. Where rule violations do not hinder our review, however, we may still reach the merits of a party's argument. See *In re S.F.*, 2020 IL App (2d) 190248, ¶ 16 (declining to strike portions of a noncomplying brief where the violations in question did not "hinder or preclude review" (internal quotation marks omitted)). Here, the legal framework for our consideration of this question is well established. We decline the State's invitation to dismiss this appeal or to strike or disregard part or all of Ms. Plascencia's arguments and instead address the merits.

¶ 45    When reviewing the sufficiency of the evidence at trial, our inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We "must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Givens*, 237 Ill. 2d 311, 334 (2010)) and will not reverse a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt" (*People v. Bradford*, 2016 IL 118674, ¶ 12).

¶ 46    Ms. Plascencia argues that the trial court's findings were inconsistent with the video evidence in this case. She urges us "to review the video in slow-motion" and to "catch every action frame-by-frame." If we do this, she insists, we will see that while standing on the doorstep of Ms. Plascencia's home, Ms. Pantoja "lean[s] into the space where [Ms. Plascencia] is standing" and, while "adopting a threatening manner," "crosses the plane into the home" with her left arm "lifted at shoulder length." Ms. Plascencia maintains that the video thus corroborates her testimony that

Ms. Pantoja was the first to make physical contact, touching Ms. Plascencia's cheek with her hand.

¶ 47    The video that Ms. Plascencia deems critical to our determination of this issue is not a part of the record on appeal. We granted defense counsel's request, on December 15, 2023, and again on January 23, 2024, for leave to supplement the record on appeal in this matter with certain items that she represented were in her possession, including the video shown at trial. We reminded counsel of this on May 16, 2025, and entered an order giving her one additional week to supplement the record with those materials. She has not done so.

¶ 48    As the appellant, it is Ms. Plascencia's burden to present a sufficiently complete record to support her claims. *Chicago Title & Trust Co., Trustee Under Trust No. 89-044884 v. Chicago Title & Trust Co., Trustee Under Trust No. 1092636*, 248 Ill. App. 3d 1065, 1075 (1993) (citing *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984)). We must resolve any doubts which may arise from the incompleteness of the record against her and in the State's favor. *Id.* Ms. Plascencia insists that the trial court's findings conflict with what is shown in the video, but without the video itself, we cannot say whether that is true and indeed must conclude that it is not.

¶ 49    We note, however, that even if the events depicted in the video were exactly as Ms. Plascencia has described them in her brief, they would provide no basis on which to reverse the trial court's finding of guilt.  The elements of self-defense are (1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable. *People v. Gray*, 2017 IL 120958, ¶ 50. Ms. Plascencia only argues that the video evidence was "consistent with" her testimony at trial that it was Ms. Pantoja who initiated physical contact, *i.e.*, that the footage shows "contact was achievable." She acknowledges

that "[t]he contact itself is not captured on the video." The trial judge was still left to decide which version of events she believed, Ms. Plascencia's or Ms. Pantoja's, and the judge made clear when announcing her findings that she did not find Ms. Plascencia's testimony to be credible.

¶ 50    Ms. Plascencia also points out inconsistencies in Ms. Pantoja's testimony and instances where the answers she gave were evasive, but "minor variations or discrepancies" in testimony do not render a witness incredible. *People v. Givens*, 46 Ill. App. 3d 1035, 1043 (1977). And it is not our role to independently assess the credibility of witnesses or reweigh the evidence. *People v. Nere*, 2018 IL 122566, ¶ 69. That is the province of the trial court as the trier of fact. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). "The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *Gray*, 2017 IL 120958, ¶ 36. Here, even if the video evidence depicted precisely what Ms. Plascencia says it did, and even taking into consideration the reasons the trial court might have instead chosen to find Ms. Plascencia the more credible witness, the court was still free to believe either witness regarding who was the initial aggressor.

¶ 51    Moreover, even if it was firmly established that Ms. Pantoja was the first to make physical contact, not being the initial aggressor is just one element of self-defense. In *People v. Chatman*, 102 Ill. App. 3d 692, 699 (1981), cited by the State, this court determined that a jury could reasonably have concluded the defendant was the initial aggressor. But even if that were not the case, we noted, at the time the defendant stabbed the victim, the victim "was unarmed, had turned his back, and was walking away from [the] defendant." Such conduct "presented no danger of imminent attack." *Id.* The trial judge here similarly observed that Ms. Pantoja was exiting the porch and walking away when Ms. Plascencia pushed her in the back. Ms. Plascencia does not argue that this is inconsistent with what the video showed, nor does she explain why, if this was what

15

happened, she reasonably believed she was in imminent danger of harm necessitating the use of that force—something she needed to establish no matter who was the initial aggressor.

¶ 52    In sum, Ms. Plascencia has not persuaded us that the State's evidence was insufficient to support her battery conviction.

¶ 53                                    B. Speedy Trial Act

¶ 54    We next address Ms. Plascencia's argument that her right to a speedy trial was violated. The right to a speedy trial is guaranteed under both the sixth amendment and the due process clause of the federal constitution (U.S. Const., amends. VI, XIV), and by article I, section 8, of our state constitution (Ill. Const. 1970, art. I, § 8 ("In criminal prosecutions, the accused shall have the right *** to have a speedy public trial ***.")). To help protect this right, the General Assembly enacted the speedy trial statute, which establishes time periods within which an accused must be brought to trial. 725 ILCS 5/103-5 (West 2020). The statute provides that, except for periods of delay attributable to the defendant, individuals in custody must be tried within 120 days of a written demand for trial, and those on bail or recognizance must be tried within 160 days. 725 ILCS 5/103-5(a), (b) (West 2020). The remedy for a speedy trial violation is the "outright reversal of the conviction or convictions in question." *People v. Isbell*, 2020 IL App (3d) 180279, ¶ 13 (citing *People v. Beyah*, 67 Ill. 2d 423, 429 (1977)); see also 735 ILCS 5/103-5(d) (West 2020) (providing that a defendant not tried in accordance with the statute "shall be discharged from custody or released from the obligations of his bail or recognizance").

¶ 55    Here, Ms. Plascencia was released on bond pending her trial in this matter. She filed her written demand for a speedy trial on August 4, 2020, and her trial began 155 days later, on January 6, 2021. Although in the trial court both the parties and the judge appear to have been under the mistaken impression that the 120-day deadline in subsection (a) of the speedy-trial statute applied,

the State points out now on appeal that it was the 160-day deadline in subsection (b) that clearly applied. We need not determine which portions of the 155 days that elapsed here were attributable to the State and which were attributable to Ms. Plascencia because even if the entire period of delay was attributable to the State, the trial was held within 160 days.

¶ 56    As noted above, General Order 2020-07, which modified certain COVID-19 emergency measures already in place, took effect on November 23, 2020. The order provided that, except in extraordinary circumstances, all court business was to be conducted by videoconference. It further provided that "[n]o bench trials in criminal cases and no jury trials of any kind [were to] be held until further order of the court" and, in a section relating solely to criminal proceedings, that "[a]ny delays resulting from th[e] order (or its predecessors) would "not be attributable to either the State or the defendant for purposes of section 103-5 (speedy trial) of the Code." Ms. Plascencia's argument is that the speedy trial term was tolled by the order only in cases where an in-person trial was contemplated. Here, the parties had always intended to hold a trial by videoconference, and by granting the State an extension beyond the original speedy trial term, the trial court "cherry picked" which of the provisions of the order it wanted to follow, giving it a reading that improperly favored the State.

¶ 57    We need not consider whether that would have been proper, however, because although that may have been what the trial court *thought* it was doing, it is not what the court actually did. The 160-day statutory period applied, not the 120-day period, and the trial by videoconference was rescheduled and held within that period. The provision of General Order 2020-07 concerning the tolling of the speedy trial terms simply did not come into play.

¶ 58    Ms. Plascencia is clearly displeased that the trial court granted the State a continuance on December 17, 2020, when she and her counsel were ready for trial, but she has not argued that it

17

was an abuse of discretion for the court to do so. See *People v. Cobb*, 97 Ill. 2d 465, 477 (1983) (noting that "[t]he granting or refusing to grant a motion for continuance in a criminal case lies in the sound discretion of the trial court"). The only relief she seeks is the dismissal of the charge against her for a violation of section 103-5 of the Act, and the record makes clear she is not entitled to that relief.

¶ 59                                    C. Evidentiary Rulings

¶ 60    Ms. Plascencia next challenges several of the trial court's evidentiary rulings sustaining objections based on relevancy made by the State during defense counsel's cross-examination of Ms. Pantoja and direct examination of Ms. Plascencia. "Evidence is relevant if it tends to make the question of guilt more or less probable." *People v. Grayer*, 2023 IL 128871, ¶ 24. The admissibility of evidence, including a determination of its relevance, is generally entrusted to the trial court, and the court's decision will not be reversed absent an abuse of that discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12. A trial court abuses its discretion only when its ruling is arbitrary, fanciful, unreasonable, or no reasonable person would have taken the trial court's view. *People v. Cerda*, 2021 IL App (1st) 171433, ¶ 98. Here, none of the challenged rulings was an abuse of discretion.

¶ 61    Ms. Plascencia first argues that her counsel was denied the right, on direct examination, to explore Ms. Plascencia's state of mind, a matter relevant to whether she acted in self defense. In support of this argument, however, Ms. Plascencia selectively quotes only the trial court's response to her questions, in which it said: "You can't ask how she feels. That's an inappropriate question." The entire exchange, set out below, makes clear that defense counsel was not just asking Ms. Plascencia how she felt but, rather, prompting her to give legal conclusions regarding whether she believed her conduct was justified or constituted self-defense.

"Q. Miss Plascencia, do you feel that you acted in self-defense?

A. Yes.

MS. JASWAL [ASSISTANT STATE'S ATTORNEY]: Objection, your Honor, calls for a legal conclusion.

THE COURT: Sustained.

BY MS. RODRIGUEZ [DEFENSE ATTORNEY]: Miss Plascencia, do you feel that you were justified in what transpired with Miss Pantoja?

MS. JASWAL: Objection, your Honor, calls for a legal conclusion.

THE COURT: Okay. Certain words are legal conclusions, and that's up to the fact finder to determine that. It's not up for her to testify to.

BY MS. RODRIGUEZ: All right. How do you feel that you acted with regard to the interaction with Miss Pantoja?

MS. JASWAL: Objection, your Honor, to the form of the question.

THE COURT: So you can't ask how she feels. That's an inappropriate question. So I don't know what else to tell you how to phrase the question to get out what you're trying to get out.

MS. RODRIGUEZ: Well, I'm just asking her if she feels she was justified in what she did, and the Court can take that into consideration.

THE COURT: No, I can't.

MS. RODRIGUEZ: All right.

¶ 62    Ms. Plascencia then completely overstates the scope of the court's ruling, insisting that it prevented her from exploring why Ms. Pantoja was angry with Ms. Plascencia, why Ms. Pantoja came to Ms. Plascencia's house, and how A.L. ended up at Ms. Plascencia's house. None of that

is true. Before the exchange detailed above, defense counsel was able to explore each of these subjects at length with her client. As to "how [Ms. Plascencia] perceived or felt about the danger of [Ms. Pantoja] crossing the threshold" of her home, that is not a question that counsel ever asked or was prevented from asking. The closest counsel came was asking her client "How do you feel that you acted?", a question counsel acknowledged when pressed was intended to elicit whether Ms. Plascencia felt her actions were legally justified. That and the questions that preceded it were improper (see *People v. Richardson*, 2013 IL App (2d) 120119, ¶ 10 (noting that "a lay witness should not be permitted to testify to a legal conclusion at issue")), and the court did not abuse its discretion by sustaining the State's objection to that line of questioning.

¶ 63    Ms. Plascencia next argues that the court abused its discretion when, on cross-examination of Ms. Pantoja, it refused to allow her counsel to ask for Ms. Pantoja's phone number, to establish when the two women had last seen each other, or to introduce the custodial agreement for A.L. into evidence. In each instance, however, the trial court *initially* sustained an objection by the State, but ultimately allowed the evidence that counsel sought to come in.

¶ 64    For example, although the court at first did not believe that Ms. Pantoja's phone number was relevant, when counsel explained that she needed it to see whether phone records might impeach Ms. Pantoja's statement that she had not texted anyone else on the morning in question, the court overruled the State's objection and allowed the question.

¶ 65    Likewise, although the court did not at first think that when Ms. Pantoja and Ms. Plascencia had last seen each other was relevant, when defense counsel explained that it was a topic first introduced on direct examination, the court consulted its notes, found that this was true, and allowed the testimony.

¶ 66    Finally, although the court sustained the State's objections when defense counsel was

reading the custody agreement into the record and asking Ms. Pantoja to interpret that legal document for the court, the trial judge made clear that he would independently consider the document, saying "I read it. She doesn't have to tell me what it says. You don't have to read it to me. I read it." As the State points out, the court in fact cited the custody agreement twice in its written ruling.

¶ 67   None of the challenged evidentiary rulings were an abuse of discretion. To the contrary, the record indicates that the trial judge exhibited great patience during this trial, which was held under difficult circumstances, and that it granted defense counsel significant leeway in presenting her client's case.

¶ 68                                    IV. CONCLUSION

¶ 69   For all of the above reasons, we affirm Ms. Plascencia's conviction for battery.

¶ 70   Affirmed.